UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| RICK WEBER,<br><br>                Plaintiff,<br><br>vs.<br><br>FREMAR PAYROLL, LLC,<br><br>                Defendants. | 4:22-CV-04150-RAL<br><br>OPINION AND ORDER GRANTING<br>MOTION FOR SUMMARY JUDGMENT |

Plaintiff Rick Weber sued Fremar Payroll, LLC ("Fremar") after losing his job in January 2021. Doc. 1 at 1. Weber alleges that Fremar violated the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a), by firing him. Doc. 1 ¶¶ 1, 54–64. In January 2024, Fremar moved for summary judgment, Doc. 16, arguing that Weber cannot establish his prima facie case for age discrimination or, in the alternative, cannot prove that Fremar's reason for his termination was pretextual under the framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Doc. 18 at 7–14. Weber opposes summary judgment, countering that there are material questions of fact related to his prima facie case, that Fremar has not provided a nondiscriminatory reason for Weber's termination, and that any proffered reason is pretextual. Doc. 24 at 6–13. For the reasons discussed below, this Court grants Fremar's motion for summary judgment.

    **I.**       **Facts in Light Most Favorable to Weber**

1

Fremar is an agronomy-based cooperative with operations in over a dozen communities in South Dakota. Doc. 1 ¶ 5. Weber began working at Fremar in 1991, and over the years he primarily operated the payloader and drove trucks for the fertilizer operations. Doc. 1 ¶¶ 10, 12. Weber worked under supervisors Brent Sherard and Dean Schoenwald, Doc. 1 ¶ 20; Doc. 21-1 at 3, and with coworkers Logan Sanner and Josie Larson, both of whom were nearly four decades younger than Weber, see Doc. 20-5 (Sanner testifying that he was 29 years old at the time of the deposition); Doc. 21-5 at 2 (Larson noting Sanner was two years older than she). Weber referred to Sanner as "sparky," and to Sanner and Larson as "the kids," Doc. 20-1 at 17–18; Sanner and Sherard would call Weber "old man," Doc. 21-1 at 4; Doc. 21-3 at 6.[1]

During his 30-year tenure at Fremar, Weber primarily "performed his job in the manner expected by his employers, and was promoted for his efforts." Doc. 1 ¶ 11. However, Weber experienced some issues during his employment relationship with Fremar. For example, Weber did not receive a managerial position for which he applied in 2018. Doc. 1 ¶ 14. He subsequently filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), received a Right to Sue Letter in March 2019, but ultimately did not pursue the issue in court. Doc. 1 ¶ 14. Weber filed an additional complaint of discrimination with Fremar in early fall of 2020 after Fremar changed Weber's job duties, assigning him to driving the truck in addition to the payloader.[2] Doc. 1 ¶¶ 21–24. In October 2020, Weber brought concerns about "job duties that

---

[1] At some time before Weber's termination, Sherard stopped calling Weber "old man," but it is unclear when that happened. Sherard may have abandoned the nickname and begun referring to the plaintiff as "Mr. Weber" as early as 2018, but Weber did not know whether his prior discrimination allegation or this legal action was the impetus for Sherard shifting away from referring to Weber as "old man." Doc. 21-1 at 5.

[2] Weber claims Sanner took over driving the payloader at the same time Fremar adjusted his schedule, but the record does not support that claim. Weber cites Larson's testimony, in which she affirmatively answered questions from counsel that Sanner began driving the "dozer" "around the end of Rick's employment" and began driving the payloader "pretty much right after [Weber]

2

required the use of his left hand" to Fremar, who offered him a reduced schedule that would limit his hours and result in a loss of benefits; he declined the adjusted schedule. Doc. 1 ¶¶ 25–26. Weber does not bring claims for retaliation or disability related to any of these occurrences. See Doc. 1 ¶¶ 54–64 (alleging "Violation of the ADEA" as the sole count of the complaint).

Around the same time Weber's concerns with his workload and responsibilities arose, Weber's work performance appeared to suffer. First, there was an incident where Weber accidentally drove the payloader into a coworker's pickup truck, "completely demolish[ing]" it by "scoop[ing] up the back end of his pickup and smash[ing] it" when he could not see the vehicle over the payloader bucket. Doc. 21-1 at 6.

Second, in March 2019, the pin in the payloader broke. Doc. 1 ¶ 16. As instructed, Weber had a coworker fix it; four days later, however, the pin broke again, and Weber's use of the equipment in its unrepaired state caused the payloader arm to get twisted, which cost $50,000 to repair. Doc. 19; Doc. 21-1 at 16–17. One of Weber's responsibilities was to ensure the payloader was "safe to operate." Doc. 28-6 at 2. Weber claims that he "did not" inspect the pin to see if it had broken again, Doc. 21-1 at 17, but Sherard asserts the opposite, testifying that Weber "told me himself that [the pin] broke again." Doc. 28-5 at 2. In response to this incident, Fremar issued Weber a final written warning on March 6, 2019, explaining that future workplace misconduct or errors would result in termination. Doc. 1 ¶¶ 16–17.

Finally, on December 16, 2020, Weber assisted in preparing a customer order that was incorrectly "thinned." Doc. 1 ¶ 35. Fremar "thins" pure product with contaminated product by

---

was terminated." Doc. 21-5 at 2. The "dozer" and the "payloader" appear to be separate pieces of equipment. Even if the "dozer" is the same as the "payloader," Larson's testimony does not suggest that Sanner started driving the payloader in the fall of 2020 when Weber's schedule changed or before Weber was terminated from Fremar in 2021. See id. Sanner specifically testified that he did not begin to drive the payloader until early 2021. Doc. 20-5 at 4.

adding small amounts of the contaminated to the pure. Doc. 1 ¶ 33; Doc. 21-4 at 3. Contaminated product is visibly discolored, Doc. 21-1 at 14, but when thinned properly, the mixed product will still meet state requirements and be appropriate for customer orders, Doc. 21-4 at 3. On this occasion, the quantity of contaminated product far exceeded what was appropriate for the order, Doc. 27 at 1; Doc. 27-1, and the product's color indicated the shipment was "obviously contaminated," Doc. 1 ¶ 45; see also Doc. 21-1 at 14. Nonetheless, Weber and Larson, a younger employee who was responsible for loading the truck and quality control of the order, completed preparation and delivery. See Doc. 20-1 at 23–25; Doc. 21-2 at 8; Doc. 1 ¶¶ 45–47. The customer complained about the order, and it cost Fremar $1,500 to remedy the error. Doc. 1 ¶¶ 46–47; Doc. 21-1 at 20. Fremar investigated the cause of the order error, and Weber told multiple accounts of how the contaminated shipment was delivered to the customer; Fremar interpreted the conflicting explanations as dishonesty. See Doc. 19; Doc. 20-1 at 26. Larson bore the responsibility to perform any quality checks before customer orders shipped. Doc. 21-2 at 8 (Sherard explaining that it was Larson's job to check products to be delivered for contamination); Doc. 21-4 at 6 (Schoenwald stating Larson "should catch" any product contamination before delivery). Nonetheless, Fremar chose to fire Weber on January 4, 2021, and issued a written warning to Larson for the improper thinning incident. Doc. 20-1 at 2; Doc. 21-4 at 6.

After his termination, Weber filed a Charge of Discrimination with the EEOC in March 2021, and the EEOC sent its Determination and Notice of Rights to Weber on August 9, 2022. Doc. 1 ¶ 8. Weber initiated this suit thereafter. Doc. 1.

## II. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Main v. Ozark Health, Inc., 959 F.3d 319, 323 (8th Cir. 2020). Rule 56(a) places the burden on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party must establish that a material fact is genuinely disputed by either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1)(A), (B); see also Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

A party opposing a properly supported motion for summary judgment cannot rely on "[m]ere allegations [that are] unsupported by specific facts or evidence beyond the non-moving party's own conclusions." Eggers v. Wells Fargo Bank, N.A., 899 F.3d 629, 632–33 (8th Cir. 2018). In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); see also Baker v. Silver Oak Senior Living Mgmt. Co., L.C., 581 F.3d 684, 687 (8th Cir. 2009), although courts will not "resort to speculation," Baker, 581 F.3d at 687.

### III. Analysis

Weber's Complaint alleges Fremar violated the ADEA when it "applied its policies so that younger employee[s] had better terms and conditions of employment, additional promotional opportunities, and less disciplinary action than Weber . . . had," and "subjected [Weber] to arbitrary disciplinary action and termination because of his age." Doc. 1 ¶¶ 58, 60. Weber also claims his

supervisor "expressed a preference for younger employees and expressed a bias against Weber because of his older age." Doc. 1 ¶ 57. "The ADEA makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." Eggers, 899 F.3d at 633 (cleaned up and citations omitted). The "because of" language requires the plaintiff prove age was the "but-for" cause of the adverse employment action. Gross v. FBL Fin. Servs., 557 U.S. 167, 177–78 (2009); Canning v. Creighton Univ., 995 F.3d 603, 611 (8th Cir. 2021). A claim can survive summary judgment if the plaintiff "produc[es] either direct or circumstantial evidence of discrimination." Main, 959 F.3d at 323. In ADEA cases relying only on circumstantial evidence, the McDonnell Douglas burden-shifting analysis applies. Main, 959 F.3d at 323–24; see also McDonnell Douglas, 411 U.S. at 802–03 (establishing a burden shifting test for Title VII discrimination claims).

Direct evidence refers to evidence that strongly demonstrates the causal connection between the plaintiff's age and the adverse action. Morgan v. A.G. Edwards & Sons, Inc., 486 F.3d 1034, 1042–43 (8th Cir. 2007) (explaining direct evidence "directly reflect[s] the [defendant's] alleged discriminatory attitude" and "must be strong enough to show a specific link between the alleged discriminatory animus and the challenged decision" (cleaned up and citations omitted)). Weber does not present direct evidence of age discrimination and instead focuses on the McDonnell Douglas analysis.

Under the McDonnell Douglas framework, a plaintiff attempting to avoid summary judgment must first present a prima facie case of discrimination. Canning, 995 F.3d at 611. The prima facie showing shifts the burden to the defendant to offer a legitimate, nondiscriminatory reason for its action. Id. If the defendant presents such a nondiscriminatory reason, the burden

6

shifts back to the plaintiff to show the defendant's proffered reason is really a pretext for unlawful discriminatory action. Id. This Court addresses each step of the analysis in turn.

### A. This Court assumes Weber has established a prima facie case of age discrimination.

To make a prima facie showing of age discrimination sufficient to survive summary judgment, Weber must prove he "(1) was at least forty years old, (2) suffered an adverse employment action, (3) was meeting his employer's legitimate expectations at the time of the adverse employment action, and (4) was replaced by someone substantially younger." Gibson v. Am. Greetings Corp., 670 F.3d 844, 856 (8th Cir. 2012) (cleaned up and citation omitted); see also Johnson v. Runyon, 137 F.3d 1081, 1082 (8th Cir. 1998) (per curiam) (noting the fourth element differs between disparate impact and reduction-in-force cases). Making a prima facie case is not a particularly "onerous" thing to do. Torgerson v. City of Rochester, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). This Court must view the evidence in the light most favorable to the nonmoving party, but Weber cannot rely on speculation or unreasonable inferences in his favor to support his claim of age discrimination. See Baker, 581 F.3d at 687 (granting the nonmoving party "the benefit of all reasonable inferences from the evidence without resort to speculation").

For purposes of this motion, the parties do not dispute that three of the elements of a prima facie showing of age discrimination are met. Weber was 66 when he lost his job and was over 40 years old at all relevant times. Doc. 1 ¶ 3. Fremar does not argue that Weber was unqualified for his position. Weber unquestionably suffered an adverse employment action when Fremar fired him. Doc. 1 ¶ 4. The parties disagree on whether evidence of causation for the prima facie case is present.

7

Weber argues that Fremar "replace[d] him with Sanner" because Sanner took over Weber's duties after Weber's employment was terminated. Doc. 24 at 8; see also Doc. 21-3 at 4 (noting Sanner assumed Weber's role driving the payloader after Weber's termination). Evidence of being replaced by a "substantially younger worker" can create an inference of age discrimination and meet Weber's burden for his prima facia case. See Ward v. Int'l Paper Co., 509 F.3d 457, 461 (8th Cir. 2007). "[T]he prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion. In a non-[reduction-in-force] ADEA case, this requirement may be met by producing evidence that a substantially younger worker replaced the plaintiff." Ward, 509 F.3d at 461 (cleaned up and citations omitted).

Here, Sanner was nearly forty years younger than Weber, but it does not appear that Sanner actually replaced Weber. After firing Weber, Fremar did not hire Sanner, or anyone else, to replace Weber. Doc. 20-1 at 27-28. Sanner already worked at Fremar and shared a job title with Weber. Doc. 20-1 at 16–17 (Weber noting that Sanner, "I believe, had the same exact job description as I did"). Sanner's expansion of job duties to cover the tasks that Weber had previously handled fit into Sanner's existing position and does not necessarily create an inference that Fremar replaced Weber with Sanner. Nonetheless, this Court will assume, without deciding, that Weber established his prima facie case of age discrimination as other grounds more clearly justify summary judgment for Fremar. See Gibson, 670 F.3d at 856 (assuming, without deciding, that the plaintiff met the elements of its prima facie showing).

B. **Fremar's nondiscriminatory reasons for terminating Weber's employment are sufficient to meet its burden under McDonnell Douglas.**

After the plaintiff makes a prima facie case of discrimination, the burden shifts to the defendant to demonstrate that its actions were motivated by nondiscriminatory reasons. Canning,

8

995 F.3d at 611. This burden is "not onerous." Hilde v. City of Eveleth, 777 F.3d 998, 1004 (8th Cir. 2015) (quoting Torgerson, 643 F.3d at 1047). Performance at work constitutes a nondiscriminatory reason for an adverse employment action that meets the defendant's burden under McDonnell Douglas. See Ridout v. JBS USA, LLC, 716 F.3d 1079, 1084 (8th Cir. 2013) (accepting declining performance and insubordination as nondiscriminatory reasons for firing the employee); Canning, 995 F.3d at 611 (accepting a resident doctor's error at work as a nondiscriminatory explanation for the defendant's conduct).

Fremar has met its burden to show a legitimate, nondiscriminatory explanation of its decision to terminate Weber's employment. See Canning, 995 F.3d at 611. Fremar claims Weber was terminated for various reasons, including his failure to properly inspect and operate the payloader, costing the company $50,000 to repair. Doc. 19. Fremar also cites Weber's involvement in improperly thinning fertilizer that went to a customer, led to a complaint, and resulted in another $1,500 financial loss to Fremar as a reason for termination; Weber then gave various accounts of what happened, which Fremar interpreted as dishonesty that further supported termination. Doc. 19; see also Doc. 20-1 at 26 (Weber testifying to giving contradictory statements about the customer order). Fremar has presented evidence that Weber's unsatisfactory work performance, failure to comply with instructions, and inconsistent explanations for his conduct—all legitimate, nondiscriminatory motives—caused Weber's termination. See Ridout, 716 F.3d at 1085 (deciding work performance and insubordination are nondiscriminatory reasons for an adverse employment action).

**C. Weber failed to provide sufficient evidence to demonstrate Defendant's proffered reasons are mere pretext.**

Weber asserts that the reasons Fremar articulated for firing him are pretextual.³ Doc. 24 at 9, 11–13. If the defendant provides legitimate, nondiscriminatory reasons for its action, the burden shifts back to the plaintiff to show the proffered reasons are pretextual. Canning, 995 F.3d at 611. "[A] plaintiff in an ADEA suit must both (1) create a fact issue as to whether the employer's reasons for the discharge are pretextual and (2) create a reasonable inference that the plaintiff's age was a determinative factor in the discharge." Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 955 (8th Cir. 2012). Weber has failed to meet either of these requirements.

1. **Pretext Analysis**

To raise a material question of fact that the proffered explanations are pretextual, the plaintiff may demonstrate the defendant's purported reasons for taking the adverse action are false and the real reason is discriminatory, Tramp v. Associated Underwriters, Inc., 768 F.3d 793, 803–04 (8th Cir. 2014), the defendant violated its own policies, Ridout, 716 F.3d at 1084 ("The employee may demonstrate pretext by showing that it was not the employer's policy or practice to respond to such problems in the way it responded in the plaintiff's case." (cleaned up and citation omitted)), the defendant engaged in disparate treatment of the plaintiff and similarly situated employees, id. at 1085, the defendant gave inconsistent answers regarding the motive behind the action taken, Rahlf v. Mo-Tech Corp., 642 F.3d 633, 640 (8th Cir. 2011) ("Pretext may be shown with evidence that the employer's reason for the termination has changed substantially over time."

---

³ Weber's Memorandum Brief in Opposition to Defendant's Motion for Summary Judgment, Doc. 24, conflates the second and third stages of the McDonnell Douglas analysis, challenging the validity, accuracy, and truth of Fremar's nondiscriminatory reasons for firing Weber under the second step and not as part of the pretext analysis. Doc. 24 at 9–11. Weber's brief uses the subsection on pretext to simply outline rules regarding pretext and to summarize prior arguments. Doc. 24 at 11–13. As discussed, Fremar has met its burden to identify permissible grounds for its action under the McDonnell Douglas analysis, so this Court will analyze Weber's challenges to Fremar's proffered reasons as an argument that Fremar's proffered reasons for terminating Weber are pretexts for unlawful discrimination.

(cleaned up and citation omitted)), or the defendant replaced the employee with an unqualified younger employee, Loeb v. Best Buy Co., 537 F.3d 867, 875 (8th Cir. 2008) ("Pretext may be proven by evidence showing a younger, less-qualified, weaker-performing employee replaced an older employee."). Here, Weber appears to assert pretext under each of these bases, see generally Doc. 24 (listing various methods for establishing pretext), but his arguments lack support in the record.

### a. False Reasons

A plaintiff may raise a material question of fact on possible pretext by demonstrating the defendant's proffered reasons for its action are false. However, "proof that the explanation is false is necessary, but not sufficient, to show a pretext for discrimination under the ADEA. The plaintiff must show that the employer's stated reason was false and that age discrimination was the real reason" for the adverse employment action. Tramp, 768 F.3d at 804 (cleaned up and citation omitted); see also Gibson, 670 F.3d at 856 ("The showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for an employment action. A plaintiff must also demonstrate that the circumstances permit a reasonable inference of discriminatory animus." (cleaned up and citation omitted)). Weber challenges the factual basis of Fremar's proffered reasons for firing him, arguing he did not have performance issues.

Weber argues that he "was not having performance issues at work besides the change in his job duties—which were wholly caused by" Fremar "chang[ing] and cut[ting] Weber's job duties" in favor of Sanner, a younger employee. Doc. 24 at 10. This argument has two shortcomings. First, it does not challenge the factual basis of Fremar's proffered reason for Weber's termination. Instead of demonstrating that Fremar's proffered reason for termination—

11

that Weber was underperforming—was false or pretextual, Weber simply provides an excuse for his underperformance, which is insufficient to survive summary judgment. See Haigh v. Gelita USA, Inc., 632 F.3d 464, 470 (8th Cir. 2011) (explaining that the plaintiff's "justifications for his failure to meet [the employer's] expectations are not evidence that creates a genuine issue of fact as to whether [the employer's] reasons were mere pretext"). Weber, therefore, has failed to demonstrate Fremar's concern with his work performance was false. Indeed, Weber acknowledged the instances of underperformance. Doc. 21-1 at 6 (Weber identifying an incident where he drove the payloader into a coworker's pickup truck, "demolished" it, and "scooped up the back end of his pickup and smashed it"); Doc. 21-1 at 16–17 (Weber mentioning damage that occurred to the payloader after he used it without inspecting the pin); Doc. 20-1 at 7 (Weber testifying that he "needed to be more attentive because . . . [he] had made a number of mistakes" with handling the products); Doc. 21-1 at 20 (Weber testifying about the contaminated product in the customer order that led to his termination).

  Second, even if Weber's underperformance were the result of some change in duties as he contends, he neither claims nor provides evidence of how the changes in his duties stemmed from age discrimination, though he seems to suggest that his job duties were changed for the sake of Sanner, a younger employee. Doc. 24 at 10. Weber provides no support for this speculative assertion. See Doc. 24 at 10 (failing to cite to any part of the record indicating Weber's job duties were changed to benefit or favor Sanner); Doc. 28-2 at 2 (explaining Weber's duties were changed to match decreased work needs); see also Baker, 581 F.3d at 687 (granting the nonmoving party "the benefit of all reasonable inferences from the evidence without resort to speculation"). Sanner did not take over Weber's job duties until his termination. See Doc. 20-5 at 4 (Sanner explaining that his job duties were to "load truck, unload truck, unload train, cleaning, maintenance. And

12

after [Weber] was fired, . . . driving the payloader"). Weber has not demonstrated that Fremar's proffered reason for terminating his employment was false or the result of discriminatory animus.

### b. Insubordination and Policy Violations

Weber next argues that he was not insubordinate by mixing contaminated and pure products and that Fremar violated its policies by terminating him for doing so. Doc. 24 at 10–11. A plaintiff can demonstrate pretext by "showing that it was unlikely an employer would have acted on the basis of the proffered reason" or that "it was not the employer's policy or practice to respond to such problems in the way it responded in the plaintiff's case." Ridout, 716 F.3d at 1085 (cleaned up and citation omitted). Weber claims pretext under company practices based on two arguments. See Doc. 24 at 10–11.

First, Weber points to Fremar previously allowing, and even instructing, employees to mix the pure and contaminated products to excuse his preparing a shipment with an improper amount of contaminated product. See Doc. 27 at 1. Weber ignores significant differences between the approved practice of "thinning" contaminated products and the incident that led to his termination. Employees may thin a small quantity of contaminated product into a pure product, Doc. 21-4 at 4, but there was so much contaminated product added to the pure product for the order at issue that the whole order was "obviously contaminated," Doc. 1 ¶ 45; see also Doc. 27 at 1; Doc. 27-1. Here, "[t]he large amount of discolored product on top of the Urea was substantially more discolored product than Fremar should ever allow to be shipped," and "Fremar determined Rick Weber was involved in sending out this contaminated product" to the customer. Doc. 27 at 1. Moreover, Fremar found Weber's explanations for the error to be inconsistent and conflicting, which Weber, in part, acknowledges. Doc. 20-1 at 26 (Weber testifying to giving contradictory statements about the thinned delivery). Therefore, Weber has not demonstrated that Fremar's

13

proffered reason for terminating him—insubordination—is false or inconsistent with Fremar's practices because Weber acted inconsistently with the common practice to thin a *small* quantity of contaminated product into the pure.

Second, Weber argues that his termination could not have been based on mixing contaminated product into pure product because the error was not his fault: quality control over customer orders is the responsibility of plant operators and supervisors. Doc. 24 at 10–11. This argument is insufficient to demonstrate falsity and pretext because Weber still played a part in thinning the product leading to his termination and gave inconsistent and conflicting explanations of what occurred. See Doc. 27 at 1; Doc. 20-1 at 23–26. Even though final review and quality control of the order shipment was Larson's job, Doc. 21-2 at 8, Weber contributed to the errors giving rise to the customer complaint and, ultimately, his termination, see Doc. 27 at 1; Doc. 19. Weber's termination for the order error was consistent with Fremar's disciplinary process because Weber had already received a final written warning from Fremar after the payloader incident. See Doc. 26 (Human Resource Director Tammy Ford stating that Fremar's "disciplinary records show that it is common practice for Fremar to terminate an employee after he/she has previously received a warning, and then makes another mistake or violates company policy").

   c. **Disparate Treatment**

Weber next contends he suffered age discrimination when Fremar terminated him for mixing pure and contaminated fertilizer for a customer order, but Larson only received a warning and younger employees thinned products on other occasions and were not fired. Doc. 24 at 10–11. To show pretext under Eighth Circuit precedent, the plaintiff must be treated differently from younger employees who were "similarly situated in all relevant respects" to the plaintiff. Ridout, 716 F.3d at 1085 (cleaned up and citations omitted); see also Bone, 686 F.3d at 956 (describing

the similarly-situated standard as "rigorous" (cleaned up and citation omitted)). A plaintiff meeting the standard for being "similarly situated" must "establish that he or she was treated differently than other employees whose violations were of comparable seriousness." Ridout, 716 F.3d at 1085 (cleaned up and citation omitted). Weber has not shown that other employees, besides Larson, engaged in "comparabl[y] serious[]" conduct. And Weber has not shown that Larson was "similarly situated" because Larson lacked a disciplinary record similar to what Weber had.

Aside from Larson's role in the same order, Weber does not identify any other employee who was treated differently from him for similar conduct because the record does not identify any other occasion where an employee engaged in similar conduct. By mixing pure and contaminated fertilizer in a proportion that was excessive for the order, resulted in a complaint, strained a client relationship, and cost Fremar $1,500, Weber and Larson acted in a way that no other employee in the record has. See Doc. 19; Doc. 27 at 1. Therefore, characterizing the preparation of this customer order error as "comparabl[y] serious[]" to or indistinguishable from other times younger employees correctly mixed and shipped thinned product is unavailing. See Ridout, 716 F.3d at 1085 (requiring misconduct be of "comparable seriousness" for employees to be similarly situated).

Weber contends Fremar treated him differently than Larson, a younger coworker responsible for quality control on the order that led to Weber's termination and the only employee who participated in "comparabl[y] serious[]" misconduct, because Larson received a written warning but Weber was fired. Doc. 24 at 11. Weber and Larson are not similarly situated because there are qualitative differences between Weber's work and performance history and Larson's. Larson had no prior disciplinary history, so she received a written warning for the contaminated customer shipment. See Doc. 21-5 at 3; Doc. 23 at 3. Conversely, Weber had already received a

15

final written warning after the payloader incident, so he was fired. Doc. 19. Weber's prior conduct—driving the payloader into a coworker's truck and using the payloader when the pin was broken causing substantial damage to it—materially distinguishes him from Larson and explains why Larson received a written warning rather than termination of employment. See Bone, 686 F.3d at 956 (discussing employee disciplinary history and misconduct in its analysis of being similarly situated). For these reasons, Weber is not "similarly situated in all relevant respects" to Larson, and his assertion is insufficient to demonstrate pretext.

### d. Shifting Explanations

Absent an appropriate coworker comparator, a plaintiff can show pretext and persuade the court of a discriminatory motive by demonstrating that the "employer's reason for the termination has changed substantially over time." Rahlf, 642 F.3d at 640 (cleaned up and citation omitted). Weber cites various cases supporting this rule, but he fails to point to any part of the record that suggests Fremar has substantially changed its explanation for his termination.[4] In fact, the record demonstrates that Fremar consistently has identified the damage to the payloader and the customer

---

[4] Weber claims Fremar has shifted its reason for his termination because Fremar told him to mix products and then fired him after he did so for insubordination. Doc. 24 at 11; see also Doc. 21-1 at 13 (Weber explaining that Fremar would "have [him] fritter [contaminated product] away in very small quantities into the unblended product"); Doc. 20-4 at 6 (Sherard testifying that Sherard and Schoenwald "specifically told [Weber] not to" mix contaminated product into the customer order); Doc. 19 (Fremar CEO and General Manager explaining the termination decision was based on "the conclusion that he wrongfully loaded contaminated fertilizer to be shipped"). These are not the sort of "shifting explanations" to which Eighth Circuit case law refers; "shifting explanations" addresses the excuses an employer gives for the adverse employment action. See Bone, 686 F.3d at 957–58; Rahlf, 642 F.3d at 640; Baker, 581 F.3d at 689. Further, the statements do not present a "genuine dispute as to any material fact" sufficient to make summary judgment inappropriate because, even if Fremar told Weber to mix the products, the directive would have allowed adding only a small amount of contaminated product, meaning the excessively-contaminated customer order leading to Weber's termination would still be improper. Fed. R. Civ. P. 56(a); see also Doc. 27 at 1 (stating the order included "substantially more discolored product than Fremar should ever allow to be shipped").

16

order error as bases for the adverse employment action. See Doc. 19. Fremar has also claimed that Weber's various accounts of the events surrounding the improper customer order seemed dishonest and helped inform its actions. Doc. 19; Doc. 20-1 at 26. Although concern about Weber's honesty may not have been presented to Weber at the time of his termination, during the EEOC investigation, or at the beginning of litigation, this additional reason—which does not contradict or diminish the validity of the original explanations—does not constitute the type of "substantial" discrepancy that courts in the Eighth Circuit have required to show pretext based on shifting explanation. Bone, 686 F.3d at 957 ("A change in an employer's legitimate, nondiscriminatory reason for firing an employee is probative of pretext only if the discrepancy is 'substantial.'" (citation omitted)); see also id. at 957–58 (citing Twiggs v. Selig, 679 F.3d 990, 994 (8th Cir. 2012) (gender discrimination case explaining that a "shifting explanation" existed when the employers "gave two completely different explanations for their decisions" but not when the employer did "not waver[] from its one explanation for terminating" the plaintiff and determining there were no shifting explanations when "all explanations of the firing . . . revolved around" the same issue (cleaned up and citations omitted))). The evidence, even viewed in the light most favorable to Weber, does not support that Fremar "substantially" shifted its explanation of why it terminated Weber's employment. See Rahlf, 642 F.3d at 640.

  **e. Younger Replacement**

  As at the prima facie stage, Weber relies on Fremar's decision to have Sanner take over his duties at the plant as indicative of age discrimination. "Pretext may be proven by evidence showing a younger, less-qualified, weaker-performing employee replaced an older employee." Loeb, 537 F.3d at 875. As explained above, it is unclear whether Sanner, by having his existing job expand to cover what Weber had done, "replaced" Weber at all. Regardless, there is no

evidence in the record that Sanner was less qualified for the position or performed his job less effectively than Weber. For these reasons, as a matter of law, Sanner's performance of duties previously done by Weber does not demonstrate that Fremar's proffered reasons for termination were pretextual. See id. (determining the plaintiff did not establish pretext and emphasizing that "the record does not include relevant information that would lead a reasonable juror to conclude that [the alleged replacement employee] was less qualified than [the plaintiff] or that there remain material factual issues whether [the alleged replacement employee] was a liability" to the employer).

**2. Reasonable Inference of Discriminatory Animus**

Even if Weber's attempts to create a fact issue of pretext were successful, Weber has not "create[d] a reasonable inference that the plaintiff's age was a determinative factor in the discharge." Bone, 686 F.3d at 955. A plaintiff can sometimes satisfy this inquiry "without additional evidence where the overall strength of the prima facie case and the evidence of pretext suffices to show intentional discrimination," but other times the plaintiff must provide additional evidence of discriminatory animus. Rothmeier v. Investment Advisers, 85 F.3d 1328, 1335–37 (8th Cir. 1996) (cleaned up and citation omitted) (interpreting and reconciling Eighth Circuit cases regarding whether, or when, a plaintiff must provide evidence of discriminatory intent beyond what was required to establish a prima facie case and grounds to reject an employer's proffered reasons for an adverse employment action). "The focus, however, always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of the plaintiff's age." Id. at 1337. Here, Weber argues that no additional evidence is necessary to survive this final stage of the McDonnell Douglas analysis and that, even if it were, Fremar's discriminatory attitude toward

18

him evidences he was fired "because of" his age. Doc. 24 at 12. This Court disagrees on both points.

First, Weber's evidence making his prima facie case and attempting to identify questions of fact for pretext is not sufficient to create an inference that age motivated his termination. Fremar's claimed reasons for the adverse employment action all have factual support in the record, and none are false, inaccurate, or illogical. For this reason, without any additional evidence of causation, no reasonable jury could find that the "employer intentionally discriminated against the plaintiff because of the plaintiff's age." Rothmeier, 85 F.3d at 1337.

Second, Weber has not provided other evidence to show age was a determinative factor in his termination. Despite arguing that Fremar had a discriminatory attitude toward age, the record does not suggest any decisionmaker at Fremar has animus toward older employees. Weber points to his supervisor's prior habit of calling him "old man," Doc. 21-1 at 4; Doc. 24, but Sherard's statements standing alone do not evidence any discriminatory intent. Sherard had discontinued using the name for Weber before events leading to the termination, and Weber himself referred to certain younger co-employees as "the kids." Doc. 21-1 at 4–5. The "old man" reference has no connection to Weber's ultimate termination. See Montgomery v. John Deere & Co., 169 F.3d 556, 560–61 (8th Cir. 1999) (finding that calling the plaintiff "old fart," "standing alone, d[id] not provide a sufficient basis for an inference of age discrimination"). Cf. Ryther v. KARE 11, 108 F.3d 832, 842–44 (8th Cir. 1997) (en banc) (allowing a case to survive summary judgment after considering age-related comments in addition to "overwhelming evidence as to the elements of a prima facie case, and strong evidence of pretext"). Nothing suggests the comments illustrate an age-related bias or animus that played a part in Fremar's decision to fire Weber, and Weber cites to no additional causation evidence in support of his belief that Fremar engaged in age

discrimination. Therefore, these comments, standing alone, cannot support a finding that Fremar fired Weber because of his age. Weber has failed to show pretext under the third step of the McDonnell Douglas analysis.

## IV. Conclusion

The indirect evidence of age discrimination that Weber presents does not link his firing to discriminatory motive without resorting to speculation or asking the Court to make unreasonable inferences in his favor. Sherard's age-related comments, Weber's prior disciplinary record, and the fact that a younger coworker took over Weber's job duties after his termination are not enough for a reasonable fact-finder to determine Fremar's termination of his employment was "because of" his age rather than Weber's work performance at Fremar. See Gross, 557 U.S. at 177–78. When viewed in the light most favorable to Weber, the record does not raise a genuine issue of material fact to suggest Fremar's legitimate, nondiscriminatory reasons for terminating him were pretextual, and Weber's speculation that the termination was the result of his age, without more, is not enough for his claim to survive summary judgment. See Baker, 581 F.3d at 687. Fremar is entitled to summary judgment on Weber's age discrimination claim.

Accordingly, it is

ORDERED that Defendant's Motion for Summary Judgment, Doc. 16, is granted and that summary judgment in favor of Fremar enters on Weber's age discrimination claim.

DATED this 26th day of June, 2024.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE